810 A.2d 526

Jacqueline **LEADROOT**,

v.

Phillip C. **LEADROOT.**

No. 2380, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Nov. 6, 2002.

William M. Ferris (Krause & Ferris, on the brief), Annapolis, for appellant.

M. Evelyn Spurgin (Samuel J. Brown and Hillman, Brown & Darrow, P.A., on the brief), Annapolis, for appellee.

Argued before DAVIS, KENNEY and KRAUSER, JJ.

KRAUSER, Judge.

Appellant, Jacqueline E. Leadroot, appeals from an order of the Circuit Court for Anne Arundel County, claiming that the circuit court's order constitutes an untimely and therefore improper "revision" of the parties' Qualified Domestic Relations Order (QDRO). Her former husband, appellee Philip C. Leadroot, disagrees. He asserts that what appellant calls a revision was only a "clarification" of their QDRO; therefore, he claims, it was neither untimely nor improper. But, while appellee requests that we affirm the circuit court's "clarification" of the parties' QDRO, he asks that we reverse the court's denial of his request for "credit for taxes [he] paid on the pension arrearage."

After considering the parties' conflicting claims, we conclude that the circuit court's order did "revise" the QDRO, as

appellant contends. And because there was no evidence of fraud, mistake, or irregularity, we further conclude that the circuit court's belated revision of that QDRO was improper and should be reversed. On the other hand, we believe that the circuit court did not err in requiring appellee to pay appellant the pension benefits, withheld by him since his retirement, without crediting him for taxes paid on those benefits.

## BACKGROUND

On February 4, 1974, appellee, as a member of the Uniform Secret Service, began contributing to the District of Columbia Police and Firemen's Retirement Relief Fund (D.C. Retirement System). Nineteen months later, on October 25, 1975, the parties married. During their nineteen-year marriage, the couple had three children.

In 1978, appellee was transferred to Chicago to work for the Immigration and Naturalization Service. To pay for the move to Chicago, appellee redeemed the monthly retirement contributions he had made between 1974 and 1978, or as he put it, "cashed in" his retirement for those years. Five years later, in 1983, he was hired as a criminal investigator.[1] His new position enabled him to participate in the Civil Service Retirement System.

In 1991, the parties separated. On April 21, 1993, the Circuit Court for Anne Arundel County granted them a judgment of absolute divorce, and that judgment incorporated a Qualified Domestic Relations Order ("1993 QDRO"). The 1993 QDRO awarded appellant "one-half (½) of the marital property portion of each of Defendant's monthly [pension benefit] payments." It then declared

the marital portion shall be a fraction of the Defendant's full monthly benefit, the numerator of which shall be the number of months of Defendant's participation in the Plan from

---

1. The record does not provide any further information concerning this new employment.

the date of the parties' marriage (October 25, 1975) through and including November 18, 1991 and the denominator of which shall be the total number of months of Defendant's participation in the Plan.

The period of time comprising the numerator ends on November 18, 1991, the termination date agreed upon by the parties.

In 1995, appellant filed the QDRO with the Office of Personnel Management (OPM), the federal government's human resources agency, to ensure that she would receive her portion of the pension when it was distributed. Four years later, unknown to appellant, appellee transferred his retirement funds back into the D.C. Retirement System and on October 5, 1999, appellee repurchased, with his own funds, the four years of government service [2] he had redeemed during the marriage. For the sum of $3,637.87, he "bought back" his months of government service, from February 4, 1974 to February 11, 1978. By doing this, he significantly increased the total amount of annual pension benefits he would receive from the D.C. Retirement System.[3] The next month, appellee retired and began collecting his pension.

---

**2.** Section 5–704 of the District of Columbia Annotated Code provides:

(a) A member's service for the purposes of this subchapter shall mean all police or fire service and such military and government service as is authorized by such sections prior to the date of separation upon which title to annuity is based.
* * *

(e) (1) A member shall be allowed credit for government service performed prior to appointment in any of the departments mentioned in paragraph (1) of § 5–701, if such member deposits a sum equal to the entire amount, including interest (if any), refunded to him for such period of government service.

D.C.Code Ann. § 5–704 (2001).

**3.** Section 5–712 of the District of Columbia Annotated Code provides:

[A]ny other member (other than a member who is an officer or member of the Metropolitan Police force or the Fire Department of the District of Columbia who first becomes such a member after the end of such 90–day period) who completes 20 years of police or fire service may ... voluntarily retire from the service and shall be entitled to an annuity computed at the rate of 2½% of his average pay for each year of service;

When appellant learned appellee was retiring, she contacted the OPM to check on the payment of the pension's benefits. It was then that she learned appellee had transferred his pension to the D.C. Retirement System. When she contacted the D.C. Retirement System, she was informed that the 1993 QDRO was not acceptable in its present form. To be accepted by that system, she was advised, the QDRO had to be separate from the parties' judgment of divorce.

To resolve that problem, appellant filed a "Motion for Entry of Judgment and Qualified Domestic Relations Order," requesting that the circuit court issue a separate QDRO. In that motion, she also requested, among other things, an award of the retirement benefits appellee had withheld since his retirement. On February 6, 2001, the parties filed a "Joint Motion for Entry of Judgment and Qualified Domestic Relations Order," seeking the issuance of a separate QDRO.

Ultimately, the circuit court issued a separate QDRO (2001 QDRO) but reserved ruling on the pension arrearage until a hearing could be held. The new 2001 QDRO was not substantively different from the original 1993 QDRO with respect to the computation. The 2001 QDRO states:

> The amount to be paid to the Alternate Payee shall be one-half (½) of the marital property portion of each of the Employee's [Mr. Leadroot's] monthly payments. The marital property portion shall be a fraction of the Employee's full monthly benefit, *the numerator of which shall be the number of months of the Employee's qualifying participation between October 25, 1975, and November 18, 1991, inclusive,* and the denominator of which shall be the total number of months of the Employee's qualifying participation.

(emphasis added).

It did add the word "qualifying" to describe appellee's participation in the pension plan, but neither party claims that

---

D.C.Code Ann. § 5–712 (2001). In short, the formula to calculate an employee's pension benefits is 2½% X Years of Service X Average Pay. *Id.*

the addition of that word changed the meaning of that paragraph. In fact both sides concede in their briefs that no substantive change in the QDRO occurred as a result of the re-issuance of the QDRO in 2001 as a separate document.[4] Moreover, appellee did not request, at that time, any change in the language of the QDRO to reflect his repurchase of the four years that he had "cashed in" when he and appellant moved to Chicago.

Six months later, however, appellee filed a motion to modify the QDRO claiming that "the original divorce decree and QDRO had an error as to the marital portion of the retirement benefits which are owing and due" to appellant. He explained that because the parties had "received a complete payout" of his benefits for "the time period from October 25, 1974 through 1978," and because he had, after the divorce, bought back those months, with his own funds, so that he could retire early, that time period should not be included in the calculation of the marital portion of his retirement benefits. The circuit court agreed.

After a hearing, the circuit court issued a Memorandum Opinion and Order holding that the redeemed months would not be included in the calculation of the marital portion of appellee's pension benefits because "there was a mutual mistake by the parties in their calculations concerning the pension." It then found that "the marital percentage of the pension" was 53 percent and that appellant's portion was 26.5 percent. The exclusion of that time period resulted in a 4.82 percent reduction in appellant's share of her former husband's pension benefits, as she would otherwise have received 31.32 percent, and not 26.5 percent, of those benefits. The circuit court further found that appellee owed appellant pension

---

4. Appellee explained, in his brief, that a new QDRO was necessary because the District of Columbia Government required a separate order, but "[t]he substance of the order, however, was unchanged." In her reply brief, appellant agreed and further stated that "Appellee has conceded, as, indeed, the fact compelled him to do, that the entry of the February, 2001, QDRO did not change the substance of the 1993 Judgment."

payments for the period from December 1999 through May 2001. The circuit court calculated the pension arrearage based on a percentage of the gross monthly retirement payment rather than the net amount as appellee requested. It explained that it did not have sufficient information to grant appellee's request that the amount of monies owed appellant be reduced by the amount of income tax appellee had paid on those monies. It further observed that appellee could "amend his tax returns to recoup any overpayments" of federal and state taxes.

Challenging the circuit court's authority to modify a QDRO eight years after its issuance, appellant filed a "Motion to Alter or Amend Memorandum Opinion and Order". In another motion, appellee asked the court to reconsider its decision not to "reduce monies owed by [him to appellant] by any federal or state income tax payments," claiming that he had since learned, contrary to what the circuit court had stated in its opinion, that he could not amend his returns to reflect these overpayments.[5] Both motions were denied and cross-appeals followed.

## I

On appeal, appellant restates the argument she made below. She asserts that by excluding the redeemed months from the computation of the marital portion of appellee's pension benefits, the circuit court "revised" the parties' QDRO. That revision, according to appellant, violated Maryland Rule 2–535, which provides in part:

(a) Generally.—On motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take any action that it could have taken under Rule 2–534.

---

5. In making that request, appellee stated, "[t]hat in follow-up checking, it appears that an amended tax return cannot be filed because the taxes can only be deducted in the year in which the payments are made."

(b) Fraud, Mistake, Irregularity.—On motion of any party filed at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity.

Because the "revision" occurred more that thirty days after entry of judgment and because, according to appellant, it was not supported by a finding of fraud, mistake, or irregularity, it was the product of judicial error. Appellee does not disagree if in fact the circuit court's order "revised" the parties' QDRO. But he insists that it did not. According to appellee, that order "clarified" but did not "revise" the parties' QDRO. This, however, was not how he framed the issue below.

In the circuit court, appellee moved not to "clarify" but to "alter or amend" the parties' QDRO, claiming that the "Divorce Decree and the Qualified Domestic Relations Order both have an error as to the marital portion of the retirement benefits which are owing and due" to appellant. The error he maintained there was that the QDRO "has the wrong beginning date." The numerator of the fraction used to compute the marital property portion of appellee's pension benefits, he explained, should not include the months redeemed by him during the marriage and later repurchased, with non-marital funds, after the divorce. He therefore asked the circuit court to amend the QDRO so that the numerator would not include those months. And that is what the circuit court did.

Declaring that "there was a mutual mistake by the parties in their calculations concerning the pension," the circuit court found:

[T]he months redeemed by the parties must not be considered as part of the numerator in the fraction but, rather, the formula should be the number of months of the employee's qualifying participation between February 11, 1978 and November 18, 1991, a total of 165 months, as the numerator, and the denominator being the total number of months of the employee's qualifying participation, that is, 309 months, which include the redeemed months.

Explaining why it was including the redeemed months in the denominator while removing those months from the numerator, the circuit court stated that, "[a]lthough it appears to be somewhat contradictory, it should be remembered that after the divorce, [appellee] did repurchase the redeemed months" and "that this time must be part of the [appellee's] qualifying participation." And it added that to rule otherwise would grant appellant a "wind fall."

Regardless of what appellee chooses to call it, the circuit court did in fact revise the fraction used to compute the marital portion of appellee's pension benefits. It did so to correct what it believed to be "a mutual mistake by the parties." A clarification does not modify; it illuminates. And the circuit court, here, was engaged in more than simply illuminating the fraction at issue; it significantly altered that fraction so that it conformed with what the circuit court believed to be the parties' expectations.

Using the almost identical formula approved by this Court in *Bangs v. Bangs*, 59 Md.App. 350, 475 A.2d 1214 (1984), the QDRO stated that "the numerator . . . shall be the number of months of the Employee's qualifying participation between October 25, 1975, and November 18, 1991, inclusive, and the denominator . . . shall be the total number of months of the employee's qualifying participation." In other words, the numerator was to include all of the months between the date of the parties' marriage and the termination date agreed on by the parties. No distinction was made between redeemed and unredeemed months in computing the marital portion of appellee's pension benefits in 1993, when the QDRO was first issued, or in 2001, when it was re-issued as a separate order, after appellee repurchased his four years of service. Nor can we do so now without revising the parties' QDRO. To now qualify a term, which was left unqualified both in 1993 and in 2001, plainly constitutes a "revision."

Moreover, even if the circuit court is correct that "when the divorce decree was entered in 1993," appellant had no "expectation that she would have been entitled to the months that

had been redeemed during the marriage," that is irrelevant. What is relevant is that the parties agreed upon a formula that did not exclude such months if and when they were repurchased. Furthermore, the decision to repurchase the redeemed months was entirely under appellee's control. He presumably knew the terms of his retirement plan and that, at a time of his choosing, he could for a modest amount, $3,637.87, repurchase the four years of service that he and his wife had redeemed. The time he chose was after the date of the parties' divorce. And he did so knowing that the language of the QDRO did not exclude the redeemed months from the numerator. Moreover, when the circuit court subtracted the redeemed months from the numerator but left them in the denominator, it effectively ruled that the same term—"qualifying participation" meant something different in the denominator than it did in the numerator, an interpretation that defies a basic canon of contract interpretation: that the same terms are to be given the same meaning in the same document. *See* 17A C.J.S., *Contracts* § 322 (1999).

Nor can we accept the circuit court's conclusion that to include the redeemed months in the numerator would result in an unjustifiable "windfall" to appellant, who had neither anticipated their inclusion nor participated in their repurchase. Appellee repurchased four years of service. For the exiguous sum of $3,637.87, he shall receive annually ten percent more in pension benefits for the rest of his life. Given the large return for such a small investment, we cannot but conclude that the repurchased benefits were really the product of his four years of government service, three of which were during the parties' marriage, and not the small sum he paid to re-initiate those benefits. We agree with appellant's assertion that, "clearly, the service time, as opposed to the amount of the contribution, is by far the most important factor in determining the value of the benefits." In that light, it is hard to view their inclusion in the numerator as a windfall to appellant.

Nor does the fact that appellee made the repurchase with his own funds or that the increase in benefits occurred after

the parties'. divorce affect our conclusion. Not only was the sum he paid for those benefits small but he could have avoided assuming the entire burden of the repurchase by simply contacting appellant and suggesting to her that it would be in their mutual interest to jointly repurchase the months of service. This he did not do, presumably in the hope of not having to share the increase in pension benefits with her. Moreover, this Court has repeatedly held that there is nothing inappropriate about a former spouse "reap[ing] the benefit of a post-divorce increase in the value of [a] pension." *Musick v. Musick,* 144 Md.App. 494, 503, 798 A.2d 1213 (2002) (citing *Bangs,* 59 Md.App. at 367, 475 A.2d 1214). Indeed, even if the inclusion of the redeemed months in the formula for computing appellant's share of appellee's pension would result in a "windfall" to appellant, that would not alter the result we reach today, as that windfall is the product of a formula freely negotiated and agreed to by the parties.

And finally we note that to affirm the circuit court's exclusion of the redeemed months in its calculation of the marital property portion of appellee's pension benefits may encourage others in similar situations to redeem part of their pension benefits during their marriage, in anticipation of repurchasing them after divorce and thereby placing them beyond the reach of their former spouses. This would be particularly unfortunate in instances where, as here, the pension benefits were largely earned during the marriage and then repurchased after the divorce for a nominal sum.

■ Having determined that the circuit court's order did in fact revise the parties' QDRO, we now turn to the question whether Maryland Rule 2–535 would permit such a revision. As previously noted, a motion to revise a judgment must be "filed within 30 days after entry of judgment." Md. Rule 2–535(a)(2002). That deadline has of course long since passed. Nonetheless, subsection (b) of that Maryland Rule provides that "at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity."

 But fraud, mistake or irregularity must be established by clear and convincing evidence. *Tandra S. v. Tyrone W.,* 336 Md. 303, 314, 648 A.2d 439 (1994). And they "are to be narrowly defined and strictly applied." *Id.* at 315, 648 A.2d 439 (citing *Platt v. Platt,* 302 Md. 9, 13, 485 A.2d 250 (1984)). "The rationale behind strictly limiting a court's revisory power is that in today's highly litigious society, there must be some point in time when a judgment becomes final." *Id.* at 314, 648 A.2d 439.

We recently stressed how strictly that rule was to be applied in *Thacker v. Hale,* 146 Md.App. 203, 806 A.2d 751 (2002). In that case, the circuit court entered a final judgment granting the parties an absolute divorce. The judgment included a monetary award, which permitted Ms. Thacker to accelerate the balance of the award if her former spouse missed a payment. Twelve years later, after payment deadlines had repeatedly been ignored, Ms. Thacker moved to accelerate the unpaid balance of the award. The circuit court, however, found that such a provision was not permitted by the Family Law Article and declared that it constituted an irregularity under Rule 2–535(b). We disagreed.

Rejecting the circuit court's finding of "irregularity," we held that the circuit court lacked the revisory power under Rule 2–535(b) to strike the acceleration provision. *Id.* at 226–27, 806 A.2d 751. In doing so, we overruled *McClayton v. McClayton,* 68 Md.App. 615, 515 A.2d 231 (1986), to the extent that it "stood for the proposition that the erroneous inclusion of an impermissible term in the monetary award provisions of the divorce judgment is an 'irregularity'." *Thacker,* 146 Md. App. at 219, 806 A.2d 751. An irregularity, we pointed out, "usually means irregularity of process or procedure, and not an error, which in the legal parlance generally connotes departure from the truth or accuracy of which a defendant had notice and could have challenged." *Id.* at 219, 806 A.2d 751.

We also rejected the contention that it was a "mistake" under Rule 2–535(b). *Id.* at 230, 806 A.2d 751. A "mistake" under Rule 2–535(b) is "limited to a jurisdictional error, i.e.

where the court has no power to enter the judgment." *Tandra S.*, 336 Md. at 317, 648 A.2d 439. "The typical kind of mistake occurs when a judgment has been entered in the absence of valid service of process; hence, the court never obtains personal jurisdiction over a party." *Id.* at 317, 648 A.2d 439.

Nonetheless, in this case, the circuit court found that "there was a mutual mistake by the parties in their calculations concerning the pension." That is obviously not the kind of mistake contemplated by Rule 2–535(b); it has virtually nothing to with jurisdiction. Neither party has even questioned whether the circuit court had personal and subject matter jurisdiction here, which of course it did. *See* Md.Code Ann., (1999 Repl.Vol.) § 8–205 of the Fam. Law Article ("(a) ... court may transfer ownership of an interest in a pension ... (b) The court shall determine ... the terms of the transfer of the interest in the pension...."). The "mutual mistake" the circuit court found had to do with what it believed was a misunderstanding between the parties as to which months to include in calculating the marital property portion of appellee's pension benefits; in short, it was at most a contractual not a jurisdictional mistake. We therefore hold that the circuit court erred in revising the 2001 QDRO because it lacked the authority to do so under Rule 2–535(b).

### Cross–Appeal

Appellee contends that the circuit court erred when it failed to give him credit for taxes paid on the pension arrearage. Because the D.C. Retirement System would not accept the 1993 QDRO, appellee collected the entire monthly retirement benefit from December 1999 until May 2001, without forwarding any portion of those payments to appellant. He did, however, pay taxes each month on the entire benefit received.

Nonetheless, the circuit court ordered him to pay the pension benefit arrearage to appellant based upon a percentage of the gross, not net, monthly benefit. Because he cannot now recoup the taxes he paid, he claims that it is unfair to require him to pay appellant a percentage of each month's gross

benefit. In response, appellant argues that "there was and is no evidence from which the trial judge could ascertain whether she would have paid as much in income taxes as did [appellee], had her court-ordered share of the pension benefits been paid directly to her prior to June 2001."

"On appeal, we must uphold the evidentiary conclusions of the trial court unless clearly erroneous." *Strauss v. Strauss*, 101 Md.App. 490, 508, 647 A.2d 818 (1994)(citing Md. Rule 8–131(c)). Here, the circuit court found that it could not "determine federal and state income tax on monies not received by the Plaintiff without more information as to the Plaintiff's finances, which has not been provided." It also noted that appellee could "amend his tax returns to recoup any overpayments."

█ Now appellee contends, as he previously did below, that he cannot recoup those payments by amending his tax returns. But it is clear to us that the circuit court's decision to base the calculation of the arrearage on the gross and not net amount of each monthly pension payment was the result of appellee's failure to provide any factual basis for it to do otherwise. Its observation that he could recoup the taxes paid on the gross amount of each payment was only that—an observation. When the circuit court was informed by appellee that he could not recoup the taxes paid, it did not alter its decision. In choosing not to do so, it did not err.

**JUDGMENT AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**